FILED
2022 Mar-30  PM 02:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **TASHA COOLEY,** *individually and on behalf of all others similarly situated*, ) ) ) ) | |
| **Plaintiff,** ) | |
| ) | **Case No.: 2:21-cv-802-AMM** |
| **v.** ) | |
| ) | |
| **KDVH ENTERPRISES, LLC D/B/A BENTON NISSAN OF HOOVER,** ) ) ) ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION ON DEFENDANT'S MOTION TO DISMISS AND TO COMPEL ARBITRATION

This case is before the court on Defendant KDVH Enterprises, LLC d/b/a

Benton Nissan's ("Benton") Motion to Dismiss and to Compel Arbitration. Doc. 9.

For the following reasons, Benton's motion to dismiss and compel arbitration is

**GRANTED**.

## I.     BACKGROUND

On June 14, 2021, Plaintiff Tasha Cooley filed this class action complaint

against Benton, alleging that Benton "initiated non-emergency telephone calls to the

cellular telephones of [Ms. Cooley] and other members of the Class to deliver

prerecorded messages for the purpose of telemarketing" without "obtain[ing] prior

express written consent to initiate [the] calls" in violation of the Telephone

Consumer Protection Act, 47 U.S.C. §§ 227, *et seq*. ("the TCPA"). Doc. 1 ¶¶ 1, 33–34. Ms. Cooley alleges that the "prerecorded message calls were intended to promote [Benton's] business, goods and services[,] and/or sell [Ms. Cooley] a vehicle." *Id*. ¶ 13. Ms. Cooley asserts that those "unsolicited prerecorded messages caused [her] . . . harm, including invasion of privacy, aggravation, annoyance, intrusion on seclusion, trespass, and conversion," as well as "inconvenienced [Ms. Cooley] and caused disruption to [her] daily life." *Id*. ¶ 16.

On July 14, 2021, Benton filed its Motion to Dismiss and to Compel Arbitration. Doc. 9. On July 28, 2021, Ms. Cooley filed her Response in Opposition to Defendant's Motion to Dismiss and to Compel Arbitration. Doc. 14. On July 30, 2021, Benton filed its reply. Doc. 15.

## II.   STANDARD OF REVIEW

The court must decide only "whether the parties agreed to arbitrate," *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985), without deciding whether their agreement could hold up in court. The court's ruling is "in effect a summary disposition of the issue of whether or not there has been a meeting of the minds on the agreement to arbitrate," and the standard of review is analogous to a summary judgment motion. *In re Checking Acct. Overdraft Litig.*, 754 F.3d 1290, 1294 (11th Cir. 2014) (internal quotation marks omitted). Accordingly, the movant must establish "that there is no genuine dispute as to any

material fact," Fed. R. Civ. P. 56(a), on the question whether the parties agreed to arbitrate. A fact is material "if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004). A genuine dispute as to a material fact exists where "the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## III.   ANALYSIS

The Federal Arbitration Act ("the Act") applies to a written contract "evidencing a transaction involving commerce" and provides that an arbitration clause within the contract "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "Section 3 [of the Act] requires a federal court in which suit has been brought 'upon any issue referable to arbitration . . . to stay the court action pending arbitration once it is satisfied that the issue is arbitrable under the agreement." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 400 (1967). These provisions "manifest a liberal federal policy favoring arbitration agreements." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002) (internal quotation marks omitted). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor

of arbitration . . . .” *Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1264 (11th Cir. 2017) (internal quotation marks omitted).

"The threshold question of whether an arbitration agreement exists at all is 'simply a matter of contract.'" *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)). "[S]tate law generally governs whether an enforceable contract or agreement to arbitrate exists," *id.* (emphasis omitted) (internal quotation marks omitted), at least so long as that state law is consistent with "substantive federal arbitration law," *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 70–71 (2010). "A party seeking to compel arbitration has the burden of proving: (1) the existence of a contract containing an arbitration agreement and (2) that the underlying contract evidences a transaction affecting interstate commerce." *Jim Walter Homes, Inc. v. Saxton*, 880 So. 2d 428, 430 (Ala. 2003). "Once those two items have been shown, the burden shifts to the opposing party to present evidence either that the arbitration agreement is not valid or that it does not apply to the dispute in question." *Id.*

Benton asserts that, "in connection with her purchase of a motor vehicle on March 13, 2014 from Crown Nissan, Inc. ('Crown'), [Ms. Cooley] signed an Arbitration Agreement." Doc. 9 ¶ 5. Benton asserts that Crown "is a predecessor in interest to Benton" because, "[o]n April 29, 2014, after [Ms. Cooley's] purchase, Benton entered into an agreement with Crown for Benton to purchase substantially

all of the assets of Crown," including "Crown's right, title and interest in Crown's sales records, customer lists and other customer data including deal jackets." *Id*. ¶ 6. Benton asserts that "[t]he deal file for the transaction between [Ms. Cooley and Crown . . . is part of what was sold and assigned [to Benton] by Crown." *Id*. ¶ 9. Benton asserts that the deal file contained the purchase agreement between Ms. Cooley and Crown, which agreement contains the Arbitration Agreement. *See id*. ¶ 7; Doc. 9-1 at 2, 4–7.

Benton asserts that Ms. Cooley's "dispute involves matters specifically set forth in and clearly contemplated by the arbitration language" in the arbitration agreement:

> in connection with the resolution of any dispute arising out of, relating to, resulting from or concerning any contracts or agreements . . . all alleged representations, promises and covenants, issues concerning compliance with any state or federal law or regulation, and all relationships resulting therefrom, as follows: [. . .] **The undersigned agree that: (a) all disputes between us must be resolved on an individual and not class wide basis; and** (b) all disputes . . . resulting from, arising out of, relating to or concerning the transaction entered into or sought to be entered into (including but not limited to: any matters taking place either before or after the parties entered into this agreement . . . the terms of this agreement and all clauses herein contained, their breadth and scope, and any term of any agreement contemporaneously entered into by the parties; . . . the representations, promises, undertakings, warranties or covenants made by the dealer, it agents, servants, employees, successors and assigns . . . or compliance with any state or federal laws . . . [)] **shall be submitted to BINDING ARBITRATION**.

Doc. 9 ¶ 7 (emphasis in original); *see also* Doc. 9-1 at 5–7.

Benton also asserts that the deal file "contain[ed] the telephone number at issue in this case," which number is listed "in the Credit Application signed by [Ms. Cooley]." Doc. 9 ¶ 6. Benton asserts that the Credit Application signed by Ms. Cooley also provides as follows:

> TO THE EXTENT PERMITTED BY LAW, I CONSENT THAT YOU, YOUR ASSIGNEES, AND YOUR AGENTS MAY CONTACT ME AT ANY TELEPHONE NUMBER YOU HAVE FOR ME, INCLUDING ANY CELL PHONE NUMBERS AND ANY PHONE NUMBERS LISTED ON THIS DOCUMENT, BY ANY MEANS YOU SELECT, INCLUDING AN AUTOMATIC TELEPHONE DIALING SYSTEM, TEXT MESSAGING, AND/OR AN ARTIFICIAL OR PRE-RECORDED VOICE.

*Id*. ¶ 8; *see also* Doc. 9-1 at 8. Accordingly, "Benton contends that it, as an assignee of Crown, was given by [Ms. Cooley] the right to contact [her] as alleged in the Complaint." Doc. 9 ¶ 8.

In support of these assertions, Benton provides a copy of the purchase agreement between Ms. Cooley and Crown, Doc. 9-1 at 4–7, and a Credit Application signed by Ms. Cooley on March 13, 2014, *id*. at 8. Benton also provides a Declaration of Max Reeves, a Comptroller at Benton, in which he testified that those two documents "are contained within the books and records of Benton," which are "kept under [his] supervision and control." *Id*. at 1–2. Mr. Reeves testified that "Crown Nissan [is] a predecessor in interest to Benton" because, "[o]n April 28, 2014, after [Ms. Cooley's] purchase, Benton Nissan entered into an agreement with Crown Nissan for Benton Nissan to purchase substantially all of the assets of Crown

6

Nissan." *Id*. at 2. Ms. Reeves further testified that "[p]art of what was to be purchased by Benton Nissan was Crown Nissan's right, title and interest in Crown Nissan's sales records, customer lists and other customer data[,] including deal jackets." *Id*. Mr. Reeves testified that "[t]he deal file for the transactions between [Ms. Cooley] and Crown Nissan is part of what was sold and assigned to Benton Nissan," which file contained Ms. Cooley's purchase agreement and Credit Application. *Id*.

In response, Ms. Cooley asserts that Benton's motion should be denied because "Benton has not supported its argument that it is entitled to enforce a Purchase Agreement between Plaintiff and Crown." Doc. 14 at 2. Specifically, Ms. Cooley asserts that "Benton does not actually submit th[e] agreement between it and Crown Nissan, and . . . only submits a portion of the Purchase Agreement between [Ms. Cooley] and Crown Nissan." *Id*. at 2, 4. According to Ms. Cooley, "[w]ithout both entire agreements, it is impossible for the Court to determine whether [Ms. Cooley's TCPA claims against Benton should be sent to arbitration." *Id*. at 4. Ms. Cooley asserts that "Benton simply concludes that it can [enforce the agreements], relying solely on the self-serving statement of one of its employees." *Id*. at 2, 4.

In support of her assertions, Ms. Cooley cites *Bazemore*, in which case the plaintiff "applied on the Internet for a credit card[,] . . . charged several items on the card but failed to pay in full." 827 F.3d at 1327. Approximately three years after the plaintiff applied for the credit card, another entity "acquired all right, title and

interest to [the plaintiff's] account." *Id*. The plaintiff sued the successor entity pursuant to federal finance law, and the successor entity "moved to compel arbitration in reliance on an arbitration clause said to have been contained in a cardholder agreement between [the plaintiff] and its predecessor-in-interest." *Id*.

"The only evidence" of "whether [the plaintiff] agreed to any terms and conditions in the course of" applying for a credit card on the Internet was "a declaration of . . . an individual employed at the time [the plaintiff] applied for her credit card by [a company] which maintained records for such credit cards on behalf of [the predecessor-in-interest]." *Id*. The employee testified "in conclusory terms that [the plaintiff] 'accepted the terms governing her account and opened the account' . . . , [but] he did not assert that he ha[d] any personal knowledge on that score or produce any documents to support that assertion." *Id*. "[T]here [wa]s no evidence that the Internet web page or pages that [the plaintiff] viewed, or upon which she applied for her [credit card], displayed or referred to any terms or conditions of the credit card she sought, much less that she was required to consent to any such terms in order to obtain her credit card." *Id*. at 1327–28.

The employee for the records company further testified that a cardholder agreement "would have been sent to [the plaintiff] about ten days after she applied for the credit card and that it would have contained a form of the [cardholder agreement that was] attached to [the employee's] declaration." *Id*. at 1328

(alterations accepted) (emphasis omitted) (internal quotation marks omitted). The cardholder agreement attached to the employee's declaration contained the arbitration clause that the successor entity relied on in support of its motion to compel. *Id*. But the employee did not testify "that the form of the [cardholder agreement] that would have been sent to [the plaintiff] was the same as that attached to his declaration," nor did he testify "that the form of the [cardholder agreement] that would have been sent to [the plaintiff] contained an arbitration clause of any kind, much less the clause found on the form attached to his declaration." *Id*. (internal quotation marks omitted). Despite reviewing the business records in preparing for his declaration, the employee "never state[d] that a [cardholder agreement] actually was sent to [the plaintiff], merely that one would have been sent as part of the company's regular and ordinary practice." *Id*. (emphasis omitted) (internal quotation marks omitted).

The Eleventh Circuit held that the successor entity defendant's motion to compel was due to be denied because it failed to "me[e]t its burden under Georgia law to prove the existence and terms of the arbitration agreement it s[ought] to enforce." *Id*. at 1330–32. The court concluded that the successor entity (1) "presented no competent evidence as to what, if any, terms plaintiff agreed to when ordering her credit card" or "that she entered into any relevant arbitration agreement"; (2) "presented no competent evidence that a [cardholder agreement]

containing the arbitration agreement it . . . s[ought] to enforce [was] ever was mailed to [the plaintiff]"; and (3) "did not meet its burden of proving that plaintiff assented to the 'essential terms of the contract' for the simple reason that the terms of exactly what, if anything, [the plaintiff] agreed to when she applied for the credit card [we]re unknown." *Id*. at 1331.

Further, although the *Bazemore* court acknowledged "that courts routinely enforce unsigned service contracts . . . where the contract is sent to a recipient who thereafter demonstrates his or her assent to its terms by using the service provided," it observed that the successor entity could not meet its burden to prove the existence of an arbitration agreement because it did not provide the court with "(1) competent evidence that the contract was sent to the plaintiff [or] (2) a copy of the actual contract [it] w[as] seeking to enforce." *Id*. at 1332. The court observed that the successor entity did not "provide[] evidence concerning the contents of any clickwrap agreement to which plaintiff assented while ordering her credit card online." *Id*.

Unlike in *Bazemore*, Benton produced a copy of the document it seeks to enforce: the purchase agreement between Ms. Cooley and Crown (Benton's predecessor-in-interest). *See* Doc. 9-1. Even if Benton provided only a partial copy, the partial copy contains the relevant arbitration provision and Ms. Cooley's initials under that provision, *id*. at 5–6, as well as her signature, *id*. at 7. And Ms. Cooley

does not identify, nor has the court found, precedent requiring an entire agreement to be submitted in order to support a motion to compel arbitration. *See* Doc. 14. Nevertheless, it appears that Benton may have submitted a complete copy of the purchase agreement between Ms. Cooley and Crown, as the copy provided to the court contains Sections A through H, with the signature blocks located under Section H. *See* Doc. 9-1 at 4–7. Further, Ms. Cooley does not cite, nor has the court found, precedent requiring Benton to submit a copy of the agreement between it and Crown in order to prevail on its motion to compel arbitration. *See* Doc. 14. Accordingly, the court finds that Mr. Reeves's declaration in which he testified that "[t]he deal file for the transaction between [Ms. Cooley] and Crown Nissan is part of what was sold and assigned to Benton Nissan," which file includes the purchase agreement, is sufficient to establish that Benton is the assignee of that agreement.

In response, Ms. Cooley further asserts that Benton "is not a signatory to the Purchase Agreement between Crown Nissan and [Ms. Cooley]" and "has not . . . demonstrate[ed] that it is entitled as a non-signatory to enforce the Purchase Agreement." Doc. 14 at 5. In support of that assertion, Ms. Cooley cites *Taylor Group, Inc. v. Industrial Distributors International Co.*, 859 F. App'x 439 (11th Cir. 2021) and *Variable Annuity Life Insurance Co. v. LaFerrera*, No. 7:15-cv-02350-LSC, 2016 WL 9045499 (N.D. Ala. June 1, 2016), *aff'd in part, vacated in part, remanded*, 680 F. App'x 880 (11th Cir. 2017).

In *Taylor*, the plaintiff sued the defendant for trademark infringement. 859 F. App'x at 439. In 1999, the defendant entered into a marking agreement with an entity ("the *Taylor* predecessor-in-interest") that granted the defendant the right to market its products. *Id*. The marketing agreement contained an arbitration clause, and provided that "the marketing agreement could not be assigned 'in whole or in part' and that it could be terminated by either party on ninety days' written notice." *Id*. at 440. In May 2018, the *Taylor* predecessor-in-interest "sent a letter [to the defendant] terminating the marketing agreement 'effective 90 calendar days' from the date of the letter." *Id*. at 440–41. In early September 2019, the plaintiff purchased some assets from the *Taylor* predecessor-in-interest. *Id*. at 441.

In its motion to compel arbitration of the plaintiff's trademark infringement claims, the defendant argued that the plaintiff "was bound by the arbitration clause [in the marking agreement between the defendant and the *Taylor* predecessor-in-interest] because [the plaintiff] assumed the marketing agreement in its asset purchase agreement with [the *Taylor* predecessor-in-interest]." *Id*. at 449. The Eleventh Circuit found "several problems" with the defendant's argument: (1) "the asset purchase agreement was 'limited' to specific assets . . . , which did not include the marketing agreement"; (2) "at the time of the purchase, the marketing agreement was no longer one of [the *Taylor* predecessor-in-interest's] assets because it had been terminated"; and (3) "even if it was still an asset, the marketing agreement could not

have been purchased by [the plaintiff] because it could not be assigned," as "[t]he marketing agreement provided that it was 'not assignable in whole or in part by either party.'" *Id*. at 449–50. Accordingly, the Eleventh Circuit held that the plaintiff could not be compelled to arbitrate under a theory of assumption.

The *Taylor* case is unlike this case. First, Ms. Cooley does not assert, nor is there any evidence, that the asset purchase by Benton was limited to assets that did not include the purchase agreement between Crown and Ms. Cooley. Second, Ms. Cooley does not assert, nor is there any evidence, that the purchase agreement was terminated before (or after) it was assigned to Benton. Third, the court has reviewed the purchase agreement submitted by Benton, and there is no provision that the agreement is not assignable.

In *LaFerrera*, the plaintiffs sued former employees and their company, alleging that those employees were "using confidential . . . trade secrets and client information to contact and 'poach' [their] clients and provide competing services through their company." 2016 WL 9045499, at *1. During their employment with the plaintiffs, the former employees entered into agreements that included arbitration provisions. *Id*. The parties did not dispute that the claims against the former employees were subject to arbitration, but the parties disputed whether the claims against the former employee's company were arbitrable. *Id*. at *2. More specifically, the plaintiffs argued "that their claims against [the company] [we]re not subject to

arbitration because [the company] was not a party to the arbitration agreement." *Id*. Applying Alabama contract law, the district court observed that "where the language of the arbitration provisions limited arbitration to the signing parties, the Alabama Supreme Court has not allowed the claims against the nonsignatories to be arbitrated." *Id*. (alterations accepted) (internal quotation marks omitted). The court held that, because the language in the arbitration agreement was "party-specific" and "explicitly state[d] that all other disputes [we]re to be resolved through litigation," the "language [wa]s sufficiently restrictive to preclude [the company], a nonsignatory, from enforcing the agreement." *Id*. On appeal, the Eleventh Circuit "affirm[ed] the district court's rulings on the . . . [company's] request to compel arbitration." *Laferrera*, 680 F. App'x at 882–84 (internal quotation marks omitted) ("[The company] cannot enforce the agreements to arbitrate because the description of the parties subject to the agreements is so restrictive as to preclude arbitration by non-parties . . . [and] the language of the agreements to arbitrate . . . expressly states that all other disputes are not subject to arbitration.").

The *LaFerrera* case unlike this case. Here, the party seeking to enforce the arbitration agreement is a successor-in-interest to and was assigned the agreement containing the arbitration provision. Benton is not a nonparty to the agreement that seeking to enforce the arbitration provisions under Alabama's doctrine of "intertwining . . . where arbitrable and nonarbitrable claims are so closely related

that the party to a controversy subject to arbitration is equitably estopped to deny the arbitrability of the related claim." *Id*. at 883 (internal quotation marks omitted) (citing *Jenkins v. Atelier Homes, Inc.*, 62 So.3d 504, 510 (Ala. 2010)). Rather, Benton is a nonparty to the agreement seeking to enforce the arbitration provisions under a theory that, as the successor-in-interest, it was assigned the right to enforce the arbitration agreement.

In support of its assertion that, as successor-in-interest, Benton has the right to enforce the arbitration provision in the purchase agreement between Crown and Ms. Cooley, Benton cites *Nissan Motor Acceptance Corp. v. Ross*, 703 So. 2d 324 (Ala. 1997). In *Ross*, the plaintiff purchased new car from a dealership, which "transaction involved two pertinent documents: (1) a retail buyer's order, which contained an arbitration clause signed by [the plaintiff] and [the dealership]; and (2) a retail sales contract, which was assigned to [a financing company]." *Id*. at 325. "The retail buyer's order specifically incorporate[d] the retail sales contract." *Id*. A few months after the purchase, the plaintiff "had difficulty making . . . payments, and . . . she returned the car to [the dealership]." *Id*. The financing company "sold the car at a private auction and then sought to collect the $7,000 balance due on [the plaintiff's] note." *Id*. "In response, [the plaintiff] sued [the dealership] and [the financing company], alleging, among other things, misrepresentation of material facts in the sale of the automobile." *Id*.

The retail sales contract that was assigned to the financing company provided that "[the dealership] intend[ed] to sell th[e] contract to [the financing company], which . . . w[ould] become the owner of the contract and [the plaintiff's] creditor" and that, "[i]f [the dealership] transfer[ed] th[e] contract to an assignee [the plaintiff] w[ould] be given notice thereof and [the plaintiff] agree[d] that the assignee will have all of [the dealership's] rights and remedies under the contract." *Id.* at 326 (internal quotation marks omitted). Further, the retail buyer's order provided that "[t]he contract consist[ed] of the following documents: th[e] retail buyer's order [and the] retail sales contract and security agreement." *Id.* (alterations accepted) (emphasis omitted). The retail buyer's order, which incorporated the retail sales contract assigned to the financing company, further provided that "[a]ll disputes and controversies of every kind and nature between the parties hereto arising out of or in connection with this contract, its subject matter or its negotiation or any claim alleging fraud in fact, fraud in the inducement, deceit, or suppression of any material fact shall be submitted to binding arbitration." *Id.* (alterations accepted).

In *Ross*, the financing company argued that, "under the retail buyer's order," the plaintiff "agreed to arbitrate 'all disputes'; that the order specifically incorporated the retail sales contract; and that [the financing company] became a party to the retail sales contract when [the dealership] assigned it to [the financing company]." *Id.* The financing company further argued that, "through the

16

assignment[,] it step[ped] into the shoes of [the dealership], the assignor, and [wa]s entitled to arbitration, under the express provisions of the arbitration clause." *Id*.

The Alabama Supreme Court held that, "[a]s an assignee, [the financing company] simply step[ped] into the shoes of the assignor, [the dealership], a signatory to the arbitration agreement," and that "[a] valid assignment gives the assignee the same rights, benefits, and remedies that the assignor possesses." *Id*. Accordingly, the court held that the financing company "ha[d] the right to compel arbitration." *Id*.

Like in *Ross*, Benton asserts that "it is the successor to Crown Nissan, and therefore may enforce the agreement as a matter of Alabama contract law." Doc. 15 at 1. Benton provides a declaration in which Mr. Reeves testified that Benton was "sold and assigned" the "deal file for the transactions between [Ms. Cooley] and Crown," which file contained the purchase agreement in which the arbitration agreement is located. *See* Doc. 9-1 at 2, 4–7. Other than asserting that Benton failed to produce the assignment agreement between it and Crown, Ms. Cooley does not present evidence or argument that contradicts Ms. Reeves's testimony that Benton was assigned the purchase agreement. Nor does Ms. Cooley assert that the arbitration agreement itself is invalid. Accordingly, "[a]s an assignee, [Benton] simply step[ped] into the shoes of the assignor, [Crown], a signatory to the arbitration agreement," and that "valid assignment gives [Benton] the same rights, benefits, and

remedies that [Crown] possesses," including "the right to compel arbitration." *Ross*, 703 So. 2d at 326.

For the foregoing reasons, Benton has established that an enforceable arbitration agreement exits between it and Ms. Cooley.

Next, Benton must prove "that the underlying contract evidences a transaction affecting interstate commerce." *Saxton*, 880 So. 2d at 430. "The Supreme Court has interpreted the term 'involving commerce' in the [Federal Arbitration Act] as the functional equivalent of the more familiar term 'affecting commerce'—words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power." *Jenkins v. First Am. Cash Advance of Ga., LLC*, 400 F.3d 868, 874 (11th Cir. 2005) (internal quotation marks omitted).

Benton asserts that Ms. Cooley's "purchase of a motor vehicle . . . involve[d] and affect[ed] interstate commerce." Doc. 9 at 3. Ms. Cooley has not contested Benton's assertion. *See* Doc. 14. Further, the arbitration provision in the purchase agreement explicitly provides that "the undersigned and the dealer . . . stipulate and agree . . . that the contract(s) and agreements entered into by the parties concerning [the vehicle, services and products] evidence transactions and business enterprises substantially involving and affecting interstate commerce sufficiently to invoke the application of the *Federal Arbitration Act*, 9 U.S.C. § 1, *et seq*." Doc. 9-1 at 5–6. Accordingly, the court finds that their transaction involved commerce.

Because Benton has met its burden of proving the existence of an enforceable arbitration agreement and that the underlying contract affects interstate commerce, "the burden shifts to [Ms. Cooley] to present evidence either that the arbitration agreement is not valid or that it does not apply to the dispute in question." *Saxton*, 880 So. 2d at 430; *see also Edwards Motors, Inc. v. Hudgins*, 957 So. 2d 444, 447 (Ala. 2006) ("[T]he burden of proving that the dispute falls outside the scope of the arbitration agreement shifts to the nonmovant after the movant proves the existence of a contract containing an arbitration provision and that the transaction that is the subject of the contract had an impact on interstate commerce.").

Benton asserts that Ms. Cooley "agreed that the arbitrator will decide all issues of arbitrability," including "whether the agreement is broad enough in scope to cover all claims raised by [Ms. Cooley]." Doc. 9 at 8 ¶ 14. Benton cites to the arbitration provision, which provides that "[t]he undersigned agree[d] that: . . . all disputes not barred by applicable statutes of limitations, . . . including but not limited to . . . the terms of th[e purchase] agreement and all clauses [t]herein contained, their breadth and scope, and any term of any agreement contemporaneously entered into by the parties . . . shall be submitted to BINDING ARBITRATION, pursuant to the provisions of 9 *U.S.C.* § 1, et seq. and according to the Commercial Dispute Resolution Procedures and/or Consumer Protocol (depending on the amount in controversy) of the American Arbitration Association (the AAA) then existing in the

county where the transaction was entered into or sought to be entered into." Doc. 9-1 at 5 (emphasis in original).

Further, in support of that assertion, Benton cites *Jones v. Waffle House, Inc.*, 866 F.3d 1257 (11th Cir. 2017). In *Jones*, the plaintiff signed an arbitration agreement that "included a delegation provision requiring that '[t]he Arbitrator, and not any federal, state, or local court or agency, shall have authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of this Agreement.'" *Id*. at 1261–62. The defendant moved to compel arbitration pursuant to that agreement, and the district court denied that motion. *Id*. at 1262.

On appeal, the Eleventh Circuit observed that "parties may agree to arbitrate gateway questions of arbitrability including the enforceability, scope, applicability, and interpretation of the arbitration agreement." *Id*. at 1264 (citing *Rent–A–Center, W., Inc.*, 561 U.S. at 68–69). Further, "[w]hen an arbitration agreement contains a delegation provision—committing to the arbitrator the threshold determination of whether the agreement to arbitrate is enforceable—the courts only retain jurisdiction to review a challenge to that specific provision." *Jones*, 866 F.3d at 1264 (internal quotation marks omitted). "Only if [the court] determine[s] that the delegation clause is itself invalid or unenforceable may [it] review the enforceability of the arbitration agreement as a whole." *Id*. (internal quotation marks omitted). Courts "may examine a challenge to a delegation provision only if the claimant challenged the delegation

provision directly," meaning that the nonmovant "must have alleged that the delegation provision specifically—and not just the agreement as a whole—can be defeated by fraud, duress, unconscionability, or another generally applicable contract defense." *Id.* (alterations accepted) (internal quotation marks omitted).

The *Jones* court held that courts "must also decide whether the parties agreed to arbitrate gateway questions of arbitrability." *Id.* at 1267. "The Supreme Court has instructed . . . that 'when courts decide whether a party has agreed that arbitrators should decide arbitrability,' they 'should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so.'" *Id.* (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

Accordingly, in *Jones*, the Eleventh Circuit "conclude[d] that the district court erred in denying [defendant's] motion to compel arbitration" because "[t]he arbitration agreement contains a broad, valid, and enforceable delegation provision that expresses the parties' clear and unmistakable intent to arbitrate gateway questions of arbitrability" and, "[i]n the face of the Federal Arbitration Act's clear preference for and presumption in favor of arbitration, [courts] are obliged to enforce the parties' clear intent to arbitrate these issues." *Jones*, 866 F.3d at 1262.

Here, the arbitration provision delegates disputes involving "the terms of th[e purchase] agreement and all clauses [t]herein contained, their breadth and scope, and any term of any agreement contemporaneously entered into by the parties" to the

arbitrator. Doc. 9-1 at 5. And Ms. Cooley does not challenge the delegation provision directly. *See* Doc. 14. Because this delegation provision clearly and unmistakably evinces the parties' agreement to arbitrate the gateway questions of arbitrability, the arbitrator must determine the scope of the agreement. *See Jones*, 866 F.3d at 1267.

In response, Ms. Cooley asserts that Benton "waiv[ed] the delegation clause" because it "brought the issue of scope to the Court's determination." Doc. 14 at 7 (citing Doc. 9 ¶¶ 10–13). But Ms. Cooley does not cite any law in support of her waiver argument. *See* Doc. 14 at 7. In response to that assertion, Benton asserts that "a party 'may set out two or more statements of a claim or defense alternatively or hypothetically,' and a 'party may state as many separate claims or defenses as it has, regardless of consistency.'" Doc. 15 at 4 (alterations accepted) (quoting Fed. R. Civ. P. 8(d)(2)–(3)). Because Ms. Cooley has not cited any support for her waiver argument, and in light of the parties' ability to state alternative defenses under Rule 8(d), the court cannot conclude that Benton has waived its right to assert enforcement of the delegation clause by merely presenting an argument that Ms. Cooley's claims are within the scope of the arbitration agreement.

Ms. Cooley also asserts that "the delegation clause does not apply for the simple reason that Benton is not a party to the agreement, and cannot otherwise enforce it." Doc. 14 at 7. In support that that assertion, Ms. Cooley cites *Tuckman v. JPMorgan Chase Bank, N.A.*, No. 20-11242, 2021 WL 2816711 (11th Cir. July 7,

2021), *superseded*, No. 20-11242, 2021 WL 3357953 (11th Cir. Aug. 3, 2021). But *Tuckman* is inapplicable because there the court found that the parties seeking to enforce the arbitration agreement were not successors-in-interest to that agreement, and that the party opposing enforcement was not a signatory to that agreement. *See id*. at *5. Here, the court already has held that Benton has sufficiently shown that it is a successor-in-interest to the purchase agreement between Ms. Cooley and Crown, and that Ms. Cooley does not contest that she is a signatory to that agreement. *See supra* at 10–18.

Finally, Benton requests that the action "be dismissed without prejudice, or stayed pending the completion of . . . arbitration." Doc. 9 at 11 ¶ 19; *see also id*. at 10 ¶ 16. Ms. Cooley does not take a position on whether the case should be dismissed or stayed pending arbitration. *See* Doc. 14. Accordingly, the court will dismiss Ms. Cooley's claims without prejudice. *See Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338, 1353 (11th Cir. 2017) (affirming "the [d]istrict [c]ourt's dismissal of [plaintiff's] claims and its order compelling the parties to submit their dispute to arbitration").

## IV.   CONCLUSION

For the foregoing reasons, Benton's motion to dismiss and compel arbitration, Doc. 9, is **GRANTED**.

**DONE** and **ORDERED** this 30th day of March, 2022.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE